IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DERRICK C.,[1]

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 3:21-CV-498-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Social Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## BACKGROUND

On January 9, 2019, Plaintiff applied for DIB and SSI benefits alleging a disability onset date of February 16, 2016. (Tr. 20). After reconsideration, Defendant issued a Notice of Disapproved Claims dated April 2, 2020. (Tr. 190). On May 1, 2020, Plaintiff filed a request for a hearing by an Administrative Law Judge (ALJ). (Tr. 193). After holding an evidentiary hearing, the ALJ denied the application returning on November 12, 2020. (Tr. 20-39). On March 16, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. The ALJ ignored Plaintiff's severe medically determinable impairments (MDIs).

2. The ALJ failed to properly evaluate residual functional capacity (RFC).

## LEGAL STANDARD

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order:  (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows

an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

I.    **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on October 19, 2020. (Tr. 49).

Plaintiff was previously a security guard from 2014 to 2016. (Tr. 66). On October 22, 2015, Plaintiff was attacked by a bank robber on the job. (Tr. 58). Although he was not hit by a bullet, the bank robber shot at Plaintiff. (Tr. 75-76). Plaintiff tried to go back to work in December 2015, but was unable to do so. (Tr. 58). Plaintiff's impartments include PTSD, depression, anxiety, panic attacks, a left shoulder injury, a left elbow injury, neuropathy in the feet and legs, chronic cluster headaches, migraines, low back pain, sleep apnea, and high blood pressure. (*Id.*). According to Plaintiff's attorney, he had seen several psychiatric providers since 2016. (Tr. 59-61).

Plaintiff testified that the biggest obstacle keeping him from being able to work was his anger issues and his mental health. (Tr. 70). Besides his mental health, Plaintiff noted that his back issues keep him from being able to go back to being a security guard. (Tr. 72). The ALJ summarized Plaintiff's complaints as follows:

> So, we have the headaches, which can be daily at times, as he said it can get pretty severe, disorder of back pain and neuropathy that kinds of comes and goes with the weather changes, and then shoulder and elbow not bothering you too much now, especially since you had the surgery, and then more significantly is the mental health issues, which all kind of started up after the incident. Just a lot of panic attacks, anxiety, around the trauma related to that event and nightmares, and medications make it difficult for you to sleep and making you irritable and tired during the day, trouble being around other people and crowds, inside banks, things like that. Distracted by the worry, having the anxiety makes it hard for you to maintain your focus or concentration, and then, also, some depression that's from going through that and feeling like you weren't being well supported – well cared for initially, but it's gone on for a while, and also

contributes to them – some of those problems.

(Tr. 81-82).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment. Based on the hypothetical, the VE testified that there are approximately 700,000 medium-unskilled hand packager positions nationally, approximately 1,000,000 medium-unskilled janitor positions nationally, and approximately 105,000 light-unskilled laundry folder positions nationally. (Tr. 90-91). The ALJ also asked the VE about whether an individual would be able to maintain employment without a special accommodation if the individual is unable to maintain a normal work schedule. (Tr. 91). The ALJ defined the inability to maintain a normal work schedule in three ways:

1. An individual missing work at least two days per month;

2. An individual showing up late or leaving work early at least a couple of times per month; or

3. An individual is off task at least 15 percent of the workday, due to lack of focus or taking extra breaks.

(*Id.*). The VE confirmed that an individual would be unable to maintain employment if he or she is unable to maintain a normal work schedule as defined by the ALJ. (*Id.*).

    **II.**    **Relevant Medical Records**

In November 2015, Plaintiff went to the emergency department at Missouri Baptist Medical Center complaining about back and left elbow pain after "a fall at work." (Tr. 459). He had no complaints regarding his mental state. (Tr. 472). Later in November 2015, Plaintiff reported nightmares and that he "can't sleep at night and constant fear."

(Tr. 547). At the exam, Plaintiff's "mood and affect [were] appropriate." (Tr. 517, 549).

In December 2015, Plaintiff went back to the emergency department at Missouri Baptist Medical Center. He was diagnosed with an anxiety attack. (Tr. 451). Then in January 2016, Plaintiff was seen by Dr. Rachel Morel, D.O. ("Dr. Morel"). He reported daily panic attacks with shortness of breath, increased heart rate, sweating, and shaking. (Tr. 407). He reported decreased concentration. At another appointment in January 2016, Glenn Sherrod, D.O. ("Dr. Sherrod") examined Plaintiff's mental status. (Tr. 703). Dr. Sherrod observed that Plaintiff had adequate judgment and insight, and Plaintiff's "general fund of knowledge was accurate and simple two-stage commands were followed." (*Id.*).

In February 2016, Jennifer Hasak, Ph.D ("Dr. Hasak") observed that Plaintiff's affect was worrisome and sad. (Tr. 717). Plaintiff's mood was anxious and depressed, but his thought process, short-term memory, and long-term memory were all intact. (*Id.*). Dr. Hasak also noted that Plaintiff was fully oriented. (*Id.*). Besides Dr. Hasak's examination, Dr. Morel observed that Plaintiff's attention was normal. (Tr. 405). Plaintiff's memory was intact and he was alert. Gary Koenig, M.D. ("Dr. Koenig") also examined Plaintiff and found "[a]ppropriate mood and affect." (Tr. 502).

In March 2016, Dr. Hasak recorded that Plaintiff's thought process was intact. (Tr. 715). Plaintiff's affect was normal, but he was anxious and frustrated. (*Id.*). Also, in March 2016, Dr. Morel observed that his attention was decreased "as questions had to be repeated." (Tr. 403). Dr. Morel also noted that Plaintiff's memory was intact, he was alert, and "oriented x3 with average intellect." (*Id.*).

In April 2016, Plaintiff was seen by Dr. Morel. He had "not yet returned to work due to his shoulder injury." (Tr. 401). At another appointment in April 2016, Glenn Sherrod, D.O. ("Dr. Sherrod") examined Plaintiff's mental status. (Tr. 695). Dr. Sherrod observed that Plaintiff had adequate judgment and insight, and Plaintiff's "general fund of knowledge was accurate and simple two-stage commands were followed." (*Id.*).

In May 2016, Plaintiff's affect was normal. (Tr. 714). Dr. Hasak noted that Plaintiff's thought process was intact. (*Id.*). Phillip Brick, M.D. ("Dr. Brick") found that Plaintiff's mood was normal, but affect flattened. (Tr. 499). Later in May 2016, Paul M. Packman, M.D. ("Dr. Packman") conducted an Independent Medical Evaluation. (Tr. 658). Dr. Packman examined Plaintiff and noted the following:

> His mood was depressed. His affect was flat and he had significant psychomotor retardation. His speech was quite soft and quiet with significant latency of response and decreased verbal production. He was oriented to time, place, and person. He knew the President, Vice President, and former Secretary of State, and 3/3 current events. His recall of the Presidents was poor naming Obama, Clinton, Bush, and Carter. He could name 5 of the 10 largest US cities. He correctly identified 3/5 theatrical, political, and sports figures. He correctly identified 5/5 objects and their uses. He could recall 3/3 objects immediately, 2/3 objects in 1 minute, and 1/3 objects in 5 minutes. He could recall 6 digits but his response was extremely slow.

(Tr. 683).

Then in June 2016, both Dr. Koenig and Dr. Brick noted that Plaintiff had appropriate mood and affect. (Tr. 483, 495). At Plaintiff's appointment with Dr. Hasak, his affect was normal, but he was anxious and frustrated. (Tr. 714). Dr. Hasak noted that Plaintiff's thought process was intact. (*Id.*).

In July 2016, Dr. Hasak observed that Plaintiff's affect was normal, but anxious,

depressed, and frustrated. (Tr. 712-713). Plaintiff's thought process was intact. (*Id.*). He was able to concentrate. (Tr. 723). Plaintiff's flow of thought was logical and sequential. (*Id.*). By August 2016, Plaintiff's flow of thought was logical and sequential. (Tr. 721-722). He was able to concentrate. (*Id.*). Also in August, Plaintiff was examined by Dr. Sherrod. (Tr. 690). Dr. Sherrod observed that Plaintiff had adequate judgment and insight, and Plaintiff's "general fund of knowledge was accurate and simple two-stage commands were followed." (*Id.*).

In September 2016, Plaintiff's thought process was intact, and his affect was normal, but he was angry, depressed, and frustrated. (Tr. 711). His speech was at a regular rate and rhythm. (Tr. 720). Plaintiff's flow of thought was logical and sequential. (*Id.*). He was able to concentrate. (*Id.*). During a trip to the emergency department at Missouri Baptist Medical Center in November 2016, Michael Fritsche, D.O. ("Dr. Fritsche") noted that Plaintiff was cooperative with normal affect—and there was no evidence of acute anxiety or depression. (Tr. 997).

Starting in February 2017 and through November 2017, Plaintiff participated in psychotherapy with Frances Weintraub, M.S.W., L.C.S.W. (Tr. 739-770). During that time, in May 2017, Plaintiff was examined by Dr. Brick. (Tr. 1105). At the exam, Plaintiff's judgment and insight were intact. (*Id.*). Plaintiff's "rate of thoughts [were] normal, though content logical, abstract reasoning within normal limits, computation intact for basic mathematical constructs including addition and subtraction." (*Id.*). In August 2017, Plaintiff went to the emergency department at Missouri Baptist Medical Center for an injury to his left foot. (Tr. 1009). At the exam, Plaintiff had normal affect and was "[n]ot

anxious or agitated." (Doc. 1010).

In September 2017, Plaintiff was referred to Thomas Lantsberger, Ph.D. ("Dr. Lantsberger") after Dr. Packman, Plaintiff's treating psychiatrist, passed away. (Tr. 1076). Dr. Lantsberger observed that Plaintiff's "affect remained either careful or restricted/guarded." (Tr. 1086). Dr. Lantsberger noted the following:

> The results of this evaluation support the conclusion that [Plaintiff] is suffering from [PTSD]. This conclusion was opined by both Dr. Greg Bassett and Dr. Paul Packman. Of note, the IME provided by Dr. Owoso, did not support a claim of PTSD. The differences between these IME were addressed by Dr. Packman in his /IME and will not be repeated in full here. Suffice it to say, the IME by Dr. Osowo had a number of inconsistencies in its description of [Plaintiff's] symptoms and simply did not appear to fully account for the symptoms presented in this case.

(Tr. 1087). Thereafter, Dr. Lantsberger had dozens of individual therapy sessions with Plaintiff starting in October 2017 through August 2020 (Tr. 1053-1075; 1155-1189; 1276-1292; 1491-1504).

In October and December 2017, Dr. Brick examined Plaintiff and noted that his mood was normal, but his affect was flattened. (Tr. 1112, 1116). By February 2018, Plaintiff's mood was normal and affect was flattened. (Tr. 1120). Plaintiff went to the emergency department at Missouri Baptist Medical Center in April 2018 because he was having a urinary problem. (Tr. 1029). During the physical exam, Plaintiff's mood, affect, behavior, judgment, and thought content were normal. (Tr. 1031).

In July 2018, Plaintiff went to the emergency department at Missouri Baptist Medical Center for a headache. (Tr. 1020). Plaintiff had normal mood and affect. (Tr. 1022). Plaintiff appeared well and stable at discharge. (*Id*.). The emergency

department's records also note that Plaintiff was "playing on a cell phone and seen conversing with his family member in no acute distress." (*Id.*).

In June 2019, Plaintiff was evaluated by J. Coulter, Psy. D. (Tr. 1134-1138). Plaintiff was oriented to person, place, time, and situation. (Tr. 1137). Plaintiff "demonstrated intact recent and remote memory." (*Id.*). He also "demonstrated an ability to think and reason concretely." (*Id.*). His judgment and insight were fair to limited. (*Id.*). Finally, Coulter found mild impairments when interacting with others and when adapting and managing himself. (*Id.*).[2]

Also in June 2019, Marguerite Wuebker, M.D. ("Dr. Wuebker") noted that Plaintiff showed no evidence of impaired judgment or memory, and his affect was normal. (Tr. 1144). Dr. Wuebker also noted that Plaintiff was "able to understand and [ ] follow directions." (*Id.*).

By January 2020, Plaintiff went to the emergency department at Mercy Hospital in because he ran out of his medications (Tr. 1226-1229). Plaintiff was positive for dysphoric mood and sleep disturbance, but he was not nervous or anxious. (Tr. 1227). A couple months later, in March 2020, Plaintiff want to SLUCare Medical Group and was able to maintain his attention throughout the exam. (Tr. 1296). Similarly, Harry Deppe, Ph.D. ("Dr. Deppe") reported that Plaintiff had "no difficulty staying on task and his responses to questions and comments were coherent and relevant." (Tr. 1320). According to Dr. Deppe, Plaintiff's "fund of general information was good [as] [h]e was able to name five

---

[2] Notably, Plaintiff continuously reported not having children (Tr. 385, 409, 1085, 1221, 1318), but Dr. Coulter noted that Plaintiff reported having a 6-year-old daughter. (Tr. 1136).

large cities in the United States with no difficulty and was also able to correctly identify Oprah Winfrey as well as Martine Luther King, Jr." (*Id.*).

### III. State Agency Consultants' Opinions

In July 2019, Howard Tin, Psy.D, ("Tin") and Lenore Gonzalez, M.D. assessed Plaintiff's mental RFC based on a review of the record. Tin indicated that Plaintiff had moderate difficulties in interacting with others and in concentrating, persisting, and maintaining pace. (Tr. 108). Tin further indicated that Plaintiff had sustained concentration and persistence limitations. (Tr. 111). According to Tin, Plaintiff's ability to carry out detailed instructions and maintain attention and concentration for extended periods was moderately limited. (Tr. 111-112). Tin wrote, in part, "Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks." (Tr. 113). He also wrote, "Claimant is capable of performing one and two-step tasks." (*Id.*).

In April 2020, David Voss, Ph.D. and Charles Kenny, M.D., the second state agency consultant, agreed with Tin's opinion. (Tr. 136-174).

## DECISION OF THE ALJ

The ALJ followed a five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 21). The ALJ determined that Plaintiff has not engaged in substantial gainful activity since February 16, 2016, the alleged onset date. (Tr. 22). The ALJ found that Plaintiff has the following severe impairments: mild neuropathy, seizure disorder, cluster headaches, high blood pressure, post-traumatic stress disorder (PTSD), anxiety,

and depression. (Tr. 23).

The ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

1. work that avoids concentrated exposure to loud noises, vibrations, unprotected heights, and dangerous machinery;

2. work which involves simple, routine tasks, and simple work-related decisions;

3. work that involves no interaction with the public and only occasional interactions with coworkers; and

4. work that is not fast-paced such as work on an assembly line.

(Tr. 27). The ALJ also found that Plaintiff is unable to perform any past relevant work. (Tr. 37). Based on the testimony of the vocational expert, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (*Id*.).

## DISCUSSION

I. **Plaintiff's severe medically determinable impairments (MDIs)**

Plaintiff notes he "has been diagnosed with and treated for PTSD, severe anxiety and major depressive disorder, severe, with psychotic features." (Doc. 23, p. 3). Plaintiff stresses that the workers' compensation insurance carrier approved and paid for most of Plaintiff's treatment—including "multiple doctors from 2016 through the date of the hearing decision on November 12, 2020." (*Id*. at p. 4). Then Plaintiff's counsel concludes this argument by explaining that "the Stipulation for Compromise Settlement, dated October 3, 2018, WCC paid Plaintiff more than $44,000 in temporary disability, $175,000

in a compromise lump sum settlement, more than $185,000 in medical expenses (Tr. 262) and open medical expenses for future psychiatric care." (*Id.*).

The Court fails to understand the point counsel is making and thus rejects this argument.

## II.     Failing to Properly Evaluate RFC

Plaintiff argues that the "ALJ failed to engage sufficiently with the evidence." (Doc. 23, p. 5). According to Plaintiff, "[the] [ALJ] decided to pick and choose the evidence that seemed to support his unfavorable decision while ignoring substantial evidence." (*Id.*). Plaintiff notes "the ALJ failed to adequately explain why he discredited the consistent opinions from two (2) treating doctors and found non-examining and consultative evaluations to be persuasive." (*Id.* at p. 10). Plaintiff concludes "the ALJ failed to build the requisite logical bridge between the evidence that Plaintiff suffers from paranoia, psychotic symptoms, severe anxiety, homicidal and suicidal ideation, emotional instability, isolation, poor judgment and inadequate coping skills, and the ALJ's decision that Plaintiff can maintain work and interact appropriately with supervisors." (*Id.* at p. 15).

While it appears that Plaintiff's counsel is throwing a kitchen-sink collection of arguments at the Court, the Court will begin by analyzing Plaintiff's arguments as to the ALJ's alleged failure to explain why he discredited the two treating doctors. For claims filed on or after March 27, 2017,[3] the ALJ is required to evaluate the medical opinion

---

[3] Plaintiff filed his claim in 2019. (Tr. 20).

evidence under 20 C.F.R. § 404.1520c. Under this regulation, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. An ALJ is required to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." *Id*. When evaluating medical opinions, 20 C.F.R. § 404.1520c lists out factors for ALJ's to consider including: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id*. "An ALJ's decision must explain how she considered the factors of *supportability* and *consistency*, but she is not required to explain how she evaluated the other factors." *Josefina T. v. Kijakazi*, 2022 WL 2669523, at *3 (N.D. Ill. July 11, 2022) (citing 20 C.F.R. § 404.1520c(b)(2)) (emphasis added).

On the surface, it appears that the ALJ engaged sufficiently with the evidence and followed 20 C.F.R. § 404.1520c. The ALJ noted why he discredited Dr. Lantsberger's February 2020 report, noting the following:

> The undersigned does not find this assessment to be *persuasive*. While Dr. Lantsberger reported severe limitations, *he seemed to rely primary on the claimant's own self-report*. Furthermore, Dr. Lantsberger's assessment is *not consistent* with the medical evidence of record as a whole, or the consultative examinations performed by doctors experienced in conducting mental consultative examinations and familiar with the Agency's standards and regulations.

(Tr. 35) (emphasis added). The ALJ also did not find Dr. Lantsberger's assessment on September 25, 2020 to be persuasive, noting the following:

> Dr. Lantsberger's records contain limited mental status examinations

(Exhibits 20F, 27F, 40F). The medical evidence of record as a whole reflects predominately normal mental status examinations (Exhibits 2F/5, 3F/6, 8, 10, 6F/3, 7F/3, 13F/2, 7, 15F/1, 2, 3, 4, 16F/1, 2, 19F/139, 21F/10, 12-13, 32F/11, 14, 39F/8, 10). Furthermore, Dr. Coulter convincingly assessed the claimant as malingering (Exhibit 24F), and the claimant seems to persist in overstating his limitations, as during his March 2020 examination with Dr. Deppe, in which he reported he only knew three presidents when he had previously been able to report up to five (Exhibits 12F/27, 35F/3).

(Tr. 36). The ALJ further found Dr. Veluz's[4] assessment on September 30, 2020, to be unpersuasive, noting the following:

> *As Dr. Valuz's [sic] assessment is substantially the same as Dr. Lantsberger's, the same analysis applies.* However, the undersigned does note that Dr. Valuz's [sic] February and July 2020 treatment notes do not reflect any mental status examinations.

(*Id.*) (emphasis added).

However, a deeper review of the record reveals a number of problems with the ALJ's evaluation of Dr. Lantsberger and Dr. Veluz's opinions. First, the ALJ only evaluated two of Dr. Lantsberger's reports: the February 2020 and September 25, 2020 reports. Second, the ALJ asserted that Dr. Lantsberger's assessment "seemed to rely [primarily] on the claimant's own self-report[,]" (Tr. 35), but Dr. Lantsberger did not just rely on Plaintiff's self-reports. Dr. Lantsberger had dozens of sessions with Plaintiff from 2017 through 2020 and made numerous observations, including the following:

- Patient brought to appointment by cab. I smelled alcohol and confronted him. He admitted to drinking 4-5 shots of vodka in the waiting room.

- He continues to voice paranoid ideations = "I still think WC has got a hit out on me."

- Patient exhibits clinical paranoia. States he "believes that WC has a hit out

---

[4] The ALJ and the Commissioner misspelled Dr. Veluz's name as "Dr. Valuz."

      against him. He questions if I am involved.

- Patient came in very guarded and making veiled accusations that I did not send my IME to his attorney.

- Thought process remained highly impaired, characterized by paranoia and belief that he is being treated in an unjust manner.

- Patient took a cab to my office and walked away from the fair. He then locked himself in the waiting room to avoid the cab driver. He appeared alert, distressed and hostile.

- Patient continues to present w/ a blunted and intense, seething affect. He appeared more angry this visit.

(Tr. 1053-1075; 1155-1189; 1276-1292; 1491-1504).

Third, even if Dr. Lantsberger's assessment relied primarily on Plaintiff's self-reports, "psychological diagnoses typically rely heavily on self-reports." *Anthony S. v. Saul*, No. 18 CV 50220, 2020 WL 30601, at *4 (N.D. Ill. Jan. 2, 2020). The ALJ failed to explain why Dr. Lantsberger's opinion was due less weight because it was based primarily on Plaintiff's self-reporting. *See Meade v. Comm'r of Soc. Sec.*, 807 F. App'x 942, 949 (11th Cir. 2020) (finding that the ALJ erred when the "ALJ [ ] failed to explain why Dr. Hodan's opinion was due less weight because it was largely based on [plaintiff's] self-reporting, as one would expect a psychiatric evaluation to largely rely on such testimonial evidence").

Fourth, even acknowledging that the ALJ supported his explanation by noting that "[t]he medical evidence of record as a whole reflect predominately normal mental status examinations (Exhibits 2F/5, 3F/6, 8, 10, 6F/3, 7F/3, 13F/2, 7, 15F/1, 2, 3, 4, 16F/1, 2, 19F/139, 21F/10, 12-13, 32F/11, 14, 39F/8, 10)" (Tr. 36)—a deeper review of these exhibits

reveal that Exhibits 2F/5,[5] 6F/3,[6] 13F/2, 7,[7] 19F/139,[8] and 39F/8, 10[9] are visits unrelated to Plaintiff's psychiatric health. Additionally, the ALJ's cited exhibits contain significant gaps in the medical records from September 2016 to May 2017 and from May 2017 to October 2019.[10]

The same problems are present in the ALJ's evaluation of Dr. Veluz's opinion. The ALJ only evaluated Dr. Veluz's report from September 30, 2020. Then the ALJ found that Dr. Veluz's February and July 2020 treatment notes do not reflect any mental status examinations. (Tr. 36).[11] The problem is Dr. Veluz examined Plaintiff multiple times from 2017 through 2020. (Tr. 1340-1368). Certainly, Dr. Veluz's notes are difficult to decipher, but if the ALJ needed clarification of Dr. Veluz's findings, then the ALJ should have solicited additional information from Dr. Veluz. *See Moore v. Colvin*, 743 F.3d 1118, 1127

---

[5] Exhibit 2F/5 is a medical record from Plaintiff's emergency department visit to Dr. Folkert for hypertension in April 2016. (Tr. 386). Notably, the record reports that Plaintiff had "[r]ambling, disorganized thoughts." (*Id.*).
[6] Exhibit 6F/3 is a medical record from Plaintiff's visit with Dr. Koenig in June 2016 for GI bleeding and H/O) gastritis. (Tr. 483).
[7] Exhibits 13F/2, 7 are medical records from Plaintiff's visits Dr. Sherrod in April and August 2016 for headaches and back pain. (Tr. 690-695).
[8] Exhibit 19F/139 is a medical record from Plaintiff's emergency department visit at Missouri Baptist Medical Center in April 2016 for intermittent sweats, mild cough, and sneezing. (Tr. 936-938).
[9] Exhibits 39F/8, 10 are medical records from Plaintiff's examinations in October and December 2019 for hypertension (Tr. 1441-1443). Notably, Exhibits 39F/8, 10 report that Plaintiff had "poor insight." (*Id.*).
[10] The remaining exhibits include:
- Exhibits 3F/6, 8, 10 are medical records from Plaintiff's visits with Dr. Morel in February through April 2016 for acute stress disorder (Tr. 401-405);
- Exhibit 7F/3 is a medical record from Plaintiff's visit with Dr. Brick in June 2016 for headaches and PTSD (Tr. 495);
- Exhibits 15F/1, 2, 3, 4, and 16F/1, 2 are medical records from Plaintiff's visits with Dr. Montani, MD in July, August, and September 2016 for his psychiatric health (Tr. 720-730);
- Exhibits 21F/10, 12-13 are medical records from Plaintiff's comprehensive exam with Dr. Brick in May 2017 (Tr. 1101-1105); and
- Exhibits 32F/11, 14 are medical records from Plaintiff's emergency department visit at Mercy Hospital in January 2020 for running out of his medications (Tr. 1226-1229).

[11] Confusingly, the Commissioner notes that "Dr. Valuz [sic] did not have any examinations[.]" (Doc. 26, p. 5). The record appears to suggest otherwise.

(7th Cir. 2014) (noting that "[i]f the ALJ was unable to discern the basis for the treating physician's determination, then the proper course would have been to solicit additional information from [the] [physician]").

Setting aside these issues, the Seventh Circuit has explained that individuals, like Plaintiff, may have the inability to "maintain consistency in responding to different medical personnel [which] cannot automatically be ascribed to an intention to deceive." *Spiva v. Astrue*, 628 F.3d 346, 352–53 (7th Cir. 2010); *see also Thomas B. v. Saul*, 2020 WL 7490135, at *6 (N.D. Ill. Dec. 21, 2020) (acknowledging that "[t]he Seventh Circuit has warned ALJs about the danger of too quickly jumping to a malingering conclusion, especially when the claimant has a complex psychiatric illness"). The Court is not determining whether Plaintiff was malingering, but does find that the evidence was not engaged in sufficiently. As Plaintiff points out, that "Exhibit 20F/33, to which the ALJ referred, is dated September 29, 2017 (Tr. 1076, 1084), which predates Father's 'report' by almost two (2) years." (Doc. 23, p. 5). The ALJ failed to explain why he credited Plaintiff's father, even though Plaintiff had moved to Belleville, Illinois, by January 1, 2019. (Tr. 249). The ALJ further failed to build a logical bridge between the evidence and his reasoning. As Plaintiff points out, the ALJ failed to consider how Plaintiff's paranoia and mistrust may impact Plaintiff's ability to respond to both Dr. Coulter and Dr. Deppe. For all these reasons, this case must be remanded.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for

rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:  August 29, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**